## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **NAWAF MUHSIN, as the father and natural guardian for M.N.M., a minor,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 2010-060** |
| **PACIFIC CYCLE, INC., and KMART CORPORATION,** | ) ) ) | |
| **Defendants.** | ) ) | |
| _____ | ) | |

**Attorneys:**
**K. Rick Alvis, Esq.,**
Birmingham, AL
**Vincent A. Coliani, II, Esq.**,
St. Croix, USVI
    *For the Plaintiff*

**Richard Hunter, Esq.,**
St. Croix, USVI
    *For the Defendants*

## <u>MEMORANDUM OPINION</u>

**Lewis, District Judge**

THIS MATTER is before the Court on the Defendant Pacific Cycle, Inc.'s "Motion to Exclude Opinion Testimony of James Green," which was filed on March 30, 2012. (Dkt. No. 66). Defendant seeks to prevent James Green, Plaintiff's expert witness, from testifying at trial on the grounds that his opinion, as proffered in his expert report, fails to meet the admissibility requirements of Federal Rules of Evidence 702 and 703, and the principles espoused in *Daubert v. Merrill Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993). Plaintiff opposes the Motion. A

hearing on the Motion was held on May 30, 2012.  For the reasons discussed below, the Court will grant in part and deny in part the Motion.

## I.   BACKGROUND

As alleged in the Complaint, in May 2010 Plaintiff's minor child was injured when the front wheel on the "Mongoose" bicycle that he was riding broke apart, causing him to fall face first on the asphalt.  (Complaint, Dkt. 1 at ¶¶ 5-7).  Plaintiff's minor child broke his jaw and suffered other serious injuries.  *Id.* at ¶ 7.   Plaintiff, on behalf of his minor child, alleges strict products liability and negligence causes of action against Pacific Cycle, who is alleged to have manufactured the bicycle, and Kmart, who is alleged to have assembled and sold the bicycle to Plaintiff.  *Id.* at ¶¶ 10-19.

On November 30, 2011, pursuant to the Court's August 2, 2011 Scheduling Order, Plaintiff produced the report, curriculum vitae, and list of prior cases of its expert, James Green. (Dkt. No. 57).  According to his curriculum vitae, Green is the president of GE Engineering, Inc. "[a] Forensic Engineering firm that emphasizes general accident reconstruction."  (Dkt. No. 57-2).   Green has a Bachelor of Science in physical science and a Masters of Science in civil engineering.  *Id.*   He is a member of several professional engineering organizations and has participated in numerous cases involving bicycle accidents.  *Id.* at 3-6.  He has also published several articles regarding bicycle accidents and the reconstruction of bicycle accidents.  *Id.* at 6-8.

Green's expert report indicates that he was requested to "determine the causal factor of the accident that occurred to the [Plaintiff]."  (Green Report, Dkt. No. 57-1 at 1).  Under the "Engineering Analysis" section, the report notes that "[i]nspection of the subject bicycle reveals

that there were two main fracture sections of the front wheel rim.  The anecdotal information is
that the front wheel collapsed causing the accident." *Id.*

The report then states:

The subject front wheel was sent to the Laboratory of Anand Kasbekar, PhD . . .
for microanalysis.  The results of the analysis are as follows:

1. Fracture A [] is a flat brittle structure perpendicular to the side of the rim.

2. Fracture A contains significant zones of incompletely melted material.  This
   material can be seen in the microanalysis, as a translucent white resin, as
   compared to the black resin material.

3. These regions of incompletely melted material are flaws in the material that
   are similar to having pre-existing cracks in the material.

4. Fracture B [] is consistent with a typical overload failure in a glass reinforced
   polymer and most probably occurred after Fracture A, as a result of the
   collapsing wheel.

*Id.* at 3.

The report continues with "Engineering Conclusions:"

1. The causal factor of the accident that occurred to the Cyclist was the collapse
   of the front wheel rim on the subject Mongoose Bicycle.  There was no
   evidence of misuse of the subject cycle.

2. The causal factor of the wheel collapse was the *improperly manufactured
   front wheel rim*.  The improperly melted resin at Fracture A [] resulted in a
   section of the wheel being in an already weakened condition.  The weight of
   The Cyclist precipitated a condition that was already in place on the front
   wheel.

3. The subject failed front wheel was provided to Dr. Kasbekar who has
   examined and evaluated the fracture surfaces using stereo microscopy.  *Dr.
   Kasbekar's initial examination indicates the presence of a significant
   manufacturing defect in the subject wheel.  This flaw in the plastic material
   weakened the wheel and resulted in the sudden and unexpected failure.*
   Additional non-destructive analysis of the fracture surfaces is ongoing and it
   is anticipated that destructive testing may be warranted at a later date pending
   notification of all parties.

*Id.* at 6. (emphasis added).

3

The report concludes that "[t]he causal factor of this accident was the improperly manufactured front wheel of the subject Mongoose Bicycle." *Id.*

Green is the only expert disclosed by Plaintiff.  Plaintiff did not name Dr. Kasbekar as an expert or disclose him as an expert pursuant to Rule 26(a)(2).[1]  Dr. Kasbekar is not identified as an expert or witness in Plaintiff's portion of the proposed Joint Final Pretrial Order.  (*See* Dkt. No. 74 at 4).

A hearing on Defendant's Motion was held on May 30, 2012.  Plaintiff did not call any witnesses at the hearing.  Pacific Cycle called one of its designated experts, Peter Schwalje, a mechanical engineer, who testified generally concerning the injection molding of plastic.  On cross-examination, Schwalje acknowledged that he did not witness the production of the wheel at issue in this case, nor examine the specific machine that produced the wheel.

## II.   DISCUSSION

### A.  Applicable Legal Standards

Federal Rules of Civil Procedure 26(a)(2)(A)-(B) state:

(A) [A] party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705. (B) . . .  this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

---

[1]     At the May 30, 2012 hearing, the parties mentioned that Dr. Kasbekar generated a one-page report for mediation purposes.  Plaintiff does not assert that this one-page report is admissible.

4

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(A)-(B).

Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Particularly relevant to this Motion are Rules 26(a)(2)(B)(i)-(ii)—the requirements that an expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them [and] . . . the facts or data considered by the witness in forming them." These requirements exist so that an opposing party has an opportunity to fully evaluate the expert's opinion "in order to avoid an ambush at trial." *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (citation omitted); *see also Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001) ("The purpose of a "detailed and complete" expert report as contemplated by Rule 26(a), Fed. R. Civ. P. 26 advisory Committee's note, is, in part, to minimize the expense of deposing experts, and to shorten direct examination and prevent an ambush at trial."). Rule 26(a) serves to ensure that "expert reports [] include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n. 6 (7th Cir. 1998) (citations omitted). "[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *R.C. Olmstead, Inc.*, 606 F.3d at

271 (quotation omitted).  A report that fails to comply with these rules is subject to exclusion under Rule 37(c)(1). *Id.* (excluding report under Rule 37(c)(1) because expert provided only "cursory support" for conclusion that defendant copied plaintiff's software).

Under the Federal Rules of Evidence, a trial judge acts as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  Rule 702 of the Federal Rules of Evidence "governs the admissibility of expert testimony [and] has a liberal policy of admissibility."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).  Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Thus, "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 530 F.3d at 244 (citations omitted).

"Qualification requires that the witness possess specialized expertise." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (citation omitted).  This requirement is interpreted liberally.  *Id.* "[A] broad range of knowledge, skills, and training qualify an expert as such."  *Id.*  However, while general knowledge in relevant fields may be sufficient to support generalized testimony in that field, it may be insufficient to support

6

testimony concerning specialized matters. *Id*. at 323. For example, "general knowledge in the fields of psychology and human factors engineering may allow [an expert] to testify regarding proper warnings in general. But proffering admissible testimony that the proper age for jet ski use is sixteen or above requires more specific knowledge." *Id*.; *see also Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 114 (3d Cir. 1987) (holding that tractor equipment salesman lacked specialized knowledge sufficient to render him an expert as to cause of tractor fire).

Rule 703 describes the types of materials that an expert may permissibly rely on:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

Together, Rules 702 and 703 permit an expert to rely upon "facts or data" that is "of a type reasonably relied upon by experts in the field." *See* Fed R. Evid. 702 & 703. Courts have held that, under some circumstances, an expert may rely on the opinion of another expert. *See, e.g, Cholakyan v. Mercedes-Benz, USA, LLC.*, __F. Supp. 2d __, WL 1066755, at *6-7 (C.D. Cal. Mar. 28, 2012) ("an expert can appropriately rely on the opinions of others if other evidence supports his opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence."). However, "the rules do not permit an expert to rely upon opinions developed by another expert for purposes of litigation without independent verification of the underlying expert's work." *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 630 (W.D. Wash. 2011). Before an expert may rely on the expert opinion of another, the expert must "assess the validity of the opinions of the experts he relie[s] upon." *In re TMI Litig.,* 193 F.3d

613, 716 (3d Cir. 1999).   This is so because Rule 703 contemplates that a testifying expert can

"validate the facts, data and opinions he relied upon during his testimony and be subject to cross-

examination on them."   *In re Imperial Credit Indus., Inc. Secs. Litig.*, 252 F. Supp. 2d 1005,

1012 n.5 (C.D. Cal. 2003) (excluding expert opinion of Moore that relied on "excerpts from an

opinion by another expert [Davidson] generated for the purposes of another litigation . . . because

Moore himself is not qualified to perform residual valuation, he cannot 'validate' Davidson's

opinions and, therefore, those opinions cannot be subjected to meaningful adversarial testing

through cross-examination of Moore."); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-

examination [is one] traditional and appropriate means of attacking shaky but admissible

evidence.").

     The ability of a testifying expert to understand and validate the work of an expert upon

whom he or she relies is critical to the admissibility of the testifying expert's opinion:

> An expert witness is permitted to use assistants in formulating his expert opinion,
> and normally they need not themselves testify . . . Analysis becomes more
> complicated if the assistants aren't merely gofers or data gatherers but
> exercise professional judgment that is beyond the expert's ken . . . The *Daubert* test must be
> applied with due regard for the specialization of modern science. A scientist,
> however, well credentialed he may be, is not permitted to be the mouthpiece of a
> scientist in a different specialty. That would not be responsible science.

*Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612-614 (7th Cir. 2002); *see*

*also TK–7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (expert who adopted

the projections of another expert did not reasonably rely on those projections when "he knew

little or nothing at all about" the other expert and the record did not reveal what efforts the expert

independently made to corroborate the projections).[2]

---

[2]    Cases from other jurisdictions are in accord. *See Tokio Marine & Fire Ins. Co. v. Norfolk & Western Ry. Co.,* 1999 WL 12931 at *4 (4th Cir. 1999) (unpublished) ("one expert may not give the opinion of another expert who does not testify"); *American Key Corp. v. Cole National*

## B.  Analysis

### 1.  Green's Reliance on the Analysis of Dr. Kasbekar

Defendant's primary challenge to Green's expert report is that "his opinion simply regurgitates the opinion of another individual who has not been listed as a trial expert and will not be testifying."  (Dkt. No. 66 at 1).  Defendant continues that "Green has knowingly entered into a field in which he admits he is not qualified to give an opinion . . . rests his entire opinion upon a preliminary and admittedly incomplete analysis prepared by a non-testifying consultant . . . has performed no tests of any nature himself . . . [and] is not qualified to give an opinion as to the injection molding process or the cause of the accident."  *Id*. at 8-9.

In his Opposition, Plaintiff responds:

> [Green] examined the bicycle and concluded there was no misuse and that the rim failure caused the accident . . . the rim should not have failed under these conditions and therefore was [] defectively manufactured. To confirm the defect, Green asked a colleague, Dr. Anand Kasbekar of Duke University, to test the polymer used to make the rim. Kasbekar found that the polymer resin used in the rim was indeed contaminated and therefore prone to failing under normal conditions . . . all of Green's conclusions are based on sufficient facts and on reliable principles and methods. Any holes that Pacific may have poked in his analysis goes to weight, not admissibility.

---

*Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not"); *Member Services, Inc. v. Sec. Mut. Life Ins. Co. of New York*, 2010 WL 3907489, at *27 (N.D.N.Y. Sep. 30, 2010) ("While an expert may rely upon another expert to form an opinion under Rule 703, an expert may not merely recite another expert's opinion as his own."); *Deutz Corp. v. City Light & Power, Inc.*  2009 WL 2986415, at *6 (N.D. Ga. 2009) ("While Rule 703 permits an expert to rely on "facts or data" that are not otherwise admissible into evidence in forming his opinion, it does not permit an expert to simply parrot the opinions of other experts."); *Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 729 (E.D.N.C. 2007) (granting motion to exclude portions of expert reports that had incorporated the reports of withdrawn experts verbatim); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 653 (N.D. Ill. 2006) (holding that "one expert cannot be the mouthpiece for another" but permitting expert to rely on pricing data provided by another "expert" where the information was "of a type reasonably relied on by experts in [the] field.").

(Dkt. No. 70 at 1-2).   Plaintiff further argues that under rule 703, "an expert may rely on testing performed by others . . . Therefore Green's reliance on Kasbekar's examination of the rim to support Green's conclusions was proper."  *Id*. at 5-6.

At the hearing, counsel for Plaintiff further explained that Green made a "preliminary" finding that the wheel was defectively manufactured and *then* sought Dr. Kasbekar's opinion to "confirm" his initial finding.   Plaintiff contends that, even if the portions of Green's report that are based on Dr. Kasbekar's findings are excluded, Green's "preliminary" finding that the wheel was defective is nonetheless admissible.

The Court has several misgivings about Green's expert report that bear on the admissibility of his testimony.   First, Plaintiff's contention that Green made a "preliminary" finding that the wheel was defectively manufactured is not supported by Green's report or his deposition.   Green's first "Engineering Conclusion" in his report is that "[t]he causal factor of the accident that occurred to the Cyclist was the collapse of the front wheel rim on the subject Mongoose Bicycle.   There was no evidence of misuse of the subject cycle."  (Green Report, Dkt. No. 57-1 at 6).   Thus, Green attributes the cause of the accident to the collapse of the front wheel rim and essentially rules out misuse of the bicycle as the reason for the collapse and the accident.[3]

---

[3]      At the hearing, counsel for Plaintiff argued that Green's statement that "[t]here was no evidence of misuse of the subject cycle," is tantamount to a "preliminary" finding of a defective wheel.   For lack of misuse of *equate* to a finding of a defectively manufactured wheel, the report would also have to state that misuse or defective manufacturing are the *only* two possible causes for the wheel collapse.   The report does not contain such an opinion.   Rule 37(c)(1) prohibits an expert from testifying to conclusions that were not disclosed pursuant to 26(a)(2).   *See Johnson v. Vanguard Manufacturing, Inc.,* 34 F. App'x. 858, 859 (3d Cir. 2002) ("It was within the court's discretion to find that the testimony that Johnson attempted to elicit from Dr. Laird was properly excluded since it was not provided in his expert report as required by Fed. R. Civ. P. 26(a)(2)(B).").   Further, even assuming that the report fairly states such a conclusion—an

10

Green's *next* conclusion is that the "[t]he causal factor of the wheel collapse was the improperly manufactured front wheel rim. The improperly melted resin at Fracture A [] resulted in a section of the wheel being in an already weakened condition." *Id*. As is evident from the second sentence in this conclusion and as discussed more fully below, Green's only *stated* support for his defective wheel conclusion is the analysis and findings of Dr. Kasbekar. Contrary to counsel's assertion, there is no support in Green's report for the proposition that Green made a "preliminary" finding of a defective wheel, independent of Dr. Kasbekar.[4] Thus, there is no "preliminary" finding to admit at trial.

---

assumption unsupported by the record—such a conclusion would still be inadmissible because the report lacks any facts or data to support such a conclusion. *Salgado*, 150 F.3d at 742 n. 6 ("expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."). For these same reasons, Green's statement in his *deposition* that "I can't see anything in the fork or the frame that indicates that the bicycle was misused to the point that you would get wheel failure of a properly constructed wheel," (Dkt. No. 66-6 at 56), is also not support for Plaintiff's "preliminary" conclusion argument.

[4]     The closest Plaintiff comes to support for this "preliminary" finding contention is when Green states in his deposition that:

> I took a series of pictures of [the bicycle] . . . If your question is what did I do in addition to that analysis, I *questioned the mold failure of the wheel* and decided that I needed to have somebody that was very good at injection molding and understood the polymers and so forth involved in that process. So I contacted Dr. Kasbekar because I knew he had done quite a bit of work when he was in his Ph.D. program at Duke in that area.

(Dkt. No. 66-6 at 29-30) (emphasis added). "Questioning" the mold failure of the wheel and then sending it out for an analysis to determine whether it was defectively manufactured does not constitute an "opinion [] and the basis and reasons for [it]." Fed. R. Civ. P. 26(a)(2)(B)(i). This is especially so in view of Green's candid admission that he has no expertise in the area of injection molding. *Id*. at 31, 63-64. Further, even if the "questioning" of the mold failure were deemed to be a viable expert opinion—which it is not—Green never provides the "how and why" to support it, other than the analysis and findings of Dr. Kasbekar, which, as discussed more fully below, render any testimony of Green that the wheel was defectively manufactured inadmissible. *Salgado,* 150 F.3d at 742 n. 6; *R.C. Olmstead, Inc.*, 606 F.3d at 271.

11

Second, as identified by Pacific Cycle, Green's conclusion in his report that "[t]he causal factor of this accident was the improperly manufactured front wheel of the subject Mongoose Bicycle" is based entirely on the findings of Dr. Kasbekar. The report contains no test or analysis performed by Green to support his conclusion other than Dr. Kasbekar's findings.  At his deposition, Green acknowledged that he did not do any testing on the bicycle.  (Dkt. No. 66-6 at 43). When asked at his deposition to explain the particulars of the alleged manufacturing problem identified by Dr. Kasbekar, Green merely restated Dr. Kasbekar's findings and acknowledged that his explanation of those findings was not based on his independent expertise. *Id*. at 63-64; *see also id*. at 52 ("I don't think it's in dispute that the cause of the accident was the collapse of the front wheel. In my opinion, I think that's what caused the accident, that the wheel broke apart, and the reason it broke apart was the injection molding was improper by a very large degree, *according to Dr. Kasbekar*.") (emphasis added).

Third, Green's admitted lack of expertise regarding the manufacturing and injection molding of plastics prevents him from confirming or validating Dr. Kasbekar's analysis.  In this regard, Green stated that he was "relying on Dr. Kasbekar. It's his area, not mine." *Id*. at 31.[5] Other than being able to repeat his discussions with Dr. Kasbekar concerning Dr. Kasbekar's findings, Green admitted to a lack of the expertise required to answer questions about the injection molding of plastics or what may have caused the alleged improper manufacturing.  For example, Green acknowledged that he does not know what polymer is involved in the manufacturing of the subject wheel; does not know what the melting temperature or melting point of the polymer is; and is not familiar with the process that is used in the injection molding

---

[5]      *See also* Dkt. No. 66-6 at 63-64 ("Q: So this is not your independent expertise that you're applying to this; you're telling us what he found? A: Yes.").

of plastic wheels like the wheel involved in this case.  *Id*. at 60.  These types of questions are highly relevant to the opinion being proffered regarding the alleged manufacturing defect.

Other questioning of Green further illustrates this point.  While referring to a photograph taken by Dr. Kasbekar of a section of the subject wheel containing an alleged manufacturing defect, Green explained: "[T]hat area is the area that was improperly molded, and you'll note the cavity or void that is there.  That shouldn't be there."  *Id*. at 64.  But when later asked in his deposition whether "voids" were common within the body of plastic molded parts," Green responded "I've been told they shouldn't be common . . . *I was told by someone with expertise in the area* they shouldn't be there."  *Id*. at 86-87 (emphasis added). Green then acknowledged that he did not know how voids may form in molded plastic parts.  *Id*. at 87.  Similarly, when questioned about another photograph depicting the alleged manufacturing defect, Green was asked to identify a section of the photograph containing what the questioner described as "lines or strings."  *Id*. at 66.  Green stated that he did not know what they were but that "they shouldn't be there."  *Id*.  When questioned why they should not be there, Green replied "[b]ecause, *according to Dr. Kasbekar*, that's indicative of polymer that didn't adhere properly to itself and, as a result, is extremely weak at that point . . ." *Id*. (emphasis added).

From this questioning, it is clear that Green's understanding of the alleged defect with the injection molding of the subject wheel is derived exclusively from his discussions with Dr. Kasbekar.  As the cases demonstrate, an expert may rely and testify concerning the opinions of other experts only when the testifying expert has the specialized knowledge necessary to understand, corroborate, and articulate the science behind the opinion. *Dura Automotive,* 285 F.3d at 612-614; *TK–7 Corp.,* 993 F.2d at 732; *In re Imperial Credit Indus., Inc. Secs. Litig.*, 252

F. Supp. 2d at 1012 n.5.  Green's report and his deposition testimony confirm that Green lacks the specialized knowledge necessary to rely on the opinion of Dr. Kasbekar.

As discussed above, Rules 702 and 703 allow an expert to rely on "facts or data . . . of a type reasonably relied upon by experts in the field," Fed. R. Evid. 702 and 703, but not upon opinions developed by another expert without independent verification or validation of the underlying expert's work.  *See In re TMI Litig.,* 193 F.3d at 716; *Fosmire,* 277 F.R.D. at 630. Here, Green is not relying on *facts and data* provided by Dr. Kasbekar, but on Dr. Kasbekar's conclusion that there was a manufacturing defect with the injection molding of the subject wheel. *See Jung v. Neschis*, 2007 WL 5256966, at *16 (S.D.N.Y. Oct. 23, 2007) ("courts appear to distinguish between the rather prejudicial circumstance of experts relying upon, or reciting, the *opinions* of other experts not subject to cross-examination, and modern evidence law's apparent recognition that experts often rely on *facts and data* supplied by third-parties, including other experts.") (emphasis in original).[6]

The Northern District of Georgia's opinion in *Deutz Corp. v. City Light & Power, Inc*., 2009 WL 2986415 (N.D. Ga. 2009), cited by Defendant, is particularly on point.  There, Dr.

---

[6]     Plaintiff cites *Rondout Valley Cent. Sch. Dist. v. Coneco Corp*., 321 F. Supp. 2d 469, 479 (N.D.N.Y. 2004) and *Gussack Realty Co. v. Xerox Corp*., 224 F.3d 85, 94-95 (2d Cir. 2000), for the proposition that Green permissibly relied on Dr. Kasbekar's "testing" of the subject wheel. However, neither case supports the wholesale adoption of Dr. Kasbekar's findings present in Green's opinion.  In *Rondout Valley Cent. Sch. Dist.,* the district court held that an expert may rely on "facts and data that he did not personally collect."  321 F. Supp. at 479.  Similarly, in *Gussack Realty Co*, the Second Circuit held that it was not improper for the plaintiff's expert to rely on "data provided by [defendant's] own expert and the [New York State Department of Environmental Conservation]."  224 F.3d at 94-95 (citing Fed. R. Evid. 703).  Here, Green is not relying on "facts or data" generated by Dr. Kasbekar, but rather Dr. Kasbekar's conclusion that there is "a significant manufacturing defect in the subject wheel."  (Dkt. No. 57-1 at 6).  Neither case cited by Plaintiff stands for the proposition that the Federal Rules of Evidence allow a testifying expert to adopt the conclusions of a non-testifying expert when the testifying expert lacks the specialized scientific knowledge necessary to corroborate and explain the findings that he purports to adopt.

Avitan was designated by the plaintiff as an expert and called to testify regarding the failure of two engine generators.   *Id*. at *1.  Dr. Avitan concluded that "it is most likely that the bearings overheated due to diminished lubricity, and/or corrosion friction, and/or corrosion induced pitting." *Id*. at *3.  This conclusion was based on another expert's opinion for which Dr. Avitan did not "review and interpret the results of the test and independently confirm that there was corrosion on the bearings."  *Id*. at *5.  The district court found that "Dr. Avitan simply states that because Mr. Wilson's metallurgical testing indicated corrosion on the bearings that there was in fact corrosion . . .  Dr. Avitan is simply taking the conclusions from these reports at face value and does not have the knowledge, skill, experience, training or education to analyze the reports on his own."  *Id*. at 5.  The court concluded:

> An expert who is not qualified in the field of metallurgy is not permitted to simply adopt the conclusions of the report of a metallurgist in forming his opinion . . . Dr. Avitan did not merely use the report as data upon which an expert in his field would reasonably rely to form an opinion, but rather used the report as substantive evidence of one of his ultimate conclusions that the bearings of the subject engine were corroded . . . Accordingly, the court finds that Dr. Avitan was not qualified to offer opinions regarding the metallurgical testing of the bearings performed by Deutz or Mr. Wilson.

*Id.* at *6.

Here, as in *Deutz Corp.,* Dr. Kasbekar's opinion that there was a manufacturing defect in the injection molding of the subject wheel is the *only* stated evidence upon which Green relies in his report for his conclusion that a manufacturing defect caused the wheel to collapse.  Further, Green accepts Dr. Kasbekar's findings without review or independent corroboration, and without the qualifications to opine on the soundness of the injection molding of the subject wheel.  Thus,

Green's expert opinion is based not on *facts or data* reasonably relied upon by experts in the field, but solely on the conclusion of Dr. Kasbekar.[7]

In short, Green's conclusion that the accident was caused by a wheel that was defectively manufactured relies exclusively on the opinion of Dr. Kasbekar. However, Dr. Kasbekar has not been identified as an expert in this case and will thus not be subject to cross-examination regarding his conclusion that the subject wheel was manufactured defectively. Further, Plaintiff has advanced no evidence that Green took any steps to independently verify Dr. Kasbekar's analysis—indeed, he could not—because Green lacks specialized knowledge concerning the injection molding of plastic. Thus, the Court finds that Green's expert opinion that the subject wheel failed because of a manufacturing defect impermissibly relies on the expert opinion of Dr. Kasbekar. *In re TMI Litig.,* 193 F.3d at 715-16 ("Crawford–Brown's failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results."); *see also Fosmire,* 277 F.R.D. at 630.[8]

---

[7]     Plaintiff's opposition to Defendant's Motion highlights this point. Plaintiff goes into considerable detail regarding the reliability of *Dr. Kasbekar's* analysis, (Dkt. No. 70 at 6-7), including by providing an affidavit from Dr. Kasbekar responding to criticisms leveled at his analysis by Defendant's experts. (*See* "April 20, 2012 Declaration of Anand D. Kasbekar, PH.D.," Dkt. No. 70-2). That the reliability of the bulk of Green's expert opinion is dependent on the reliability of the findings of a non-testifying expert who has not issued a report pursuant to Federal Rule of Civil Procedure 26(a)(2), who will not be subject to cross-examination, whom the jury will not be able to evaluate, and whose findings Green cannot corroborate further confirms that Green's report does not meet the requirements of Federal Rules of Evidence 702 and 703, nor the principles espoused in *Daubert.*

[8]     Because the Court will exclude Green's testimony concerning the alleged manufacturing defect, the Court does not reach Defendant Pacific Cycle's other arguments regarding exclusion of Green's testimony in this regard.

Accordingly, the portion of Green's report relying on Dr. Kasbekar's analysis will be excluded from trial.   Green may not testify that the subject wheel rim was defectively manufactured or that the accident was caused by an improperly manufactured front wheel rim, or otherwise mention any of the analysis performed by Dr. Kasbekar.  However, Green may testify regarding "Engineering Conclusion" No. 1 in his expert report—"[t]he causal factor of the accident that occurred to the Cyclist was the collapse of the front wheel rim on the subject Mongoose Bicycle.  There was no evidence of misuse of the subject cycle." (Green Report, Dkt. No. 57-1 at 6).[9]  While not specifically couched as a challenge to this conclusion, in its Reply, Defendant Pacific Cycle argues that Green did not properly take into account the circumstances surrounding the bicycle crash, including the alleged fact that there were two people on the bicycle at the time of the accident—not one—and that the rear brakes were non-functional.  (Dkt. No. 71 at 10).  During his deposition Green explained that the addition of a second rider on the rear pegs of the bicycle would not have a material effect on the "load capacity of the front

---

[9]     Green may also testify, consistent with his deposition testimony below, regarding the basis for his conclusion that there was no evidence of misuse of the bicycle, as long as he does not offer the opinion that the accident was caused by an improperly manufactured front wheel rim:

> I can't see anything in the fork or the frame that indicates that the bicycle was misused to the point that you would get wheel failure of a properly constructed wheel. Those wheels are pretty darn strong when they're put together properly. I can't imagine that there would not be trauma to the front fork at least if the wheel had been -- or the bike had been mistreated to the point where you're jumping and stunting with it, doing that kind of thing where you're putting  a lot of force on the front of a wheel and the  front of the fork . . . . I mean these wheels are awfully, awfully strong when they're put together properly. Now, if there's spokes on there, I might say yes, you can damage the wheel. But these molded wheels typically don't fail.

(Dkt. No. 66-6 at 56-57).

wheel," (Dkt. No. 66-6 at 49), and that the brakes were functioning (*id*. at 42).  In any event, these challenges go to the weight of the testimony, not its admissibility.

<strong>2.  Plaintiff's Request to Introduce<br>the Opinion of Dr. Kasbekar</strong>

At the hearing on this matter, Plaintiff orally requested that he be allowed to introduce Dr. Kasbekar's opinion into evidence if the Court decided to grant Pacific Cycle's Motion and exclude Green from trial.  Plaintiff volunteered that he would make Dr. Kasbekar available to testify at trial, if so requested by the Court.  Pacific Cycle objected on the grounds that Plaintiff has not named Dr. Kasbekar as an expert and to do so at this stage of the proceedings would be prejudicial.

Federal Rule of Civil Procedure 26(a)(2) requires a party to disclose its expert witnesses, their opinions, and the facts upon which the opinions are based "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  Under Federal Rule of Civil Procedure 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  This Court has previously concluded that:

> In determining whether there was a substantial justification for the untimely disclosure and thus whether exclusion is warranted, courts in the Third Circuit must consider several factors: (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

*Gautier-James v. Hovensa, L.L.C.*, 2011 WL 4500153, at *5 (D.V.I. Sept. 27, 2011) (citing *Nicholas v. Penn. State University*, 227 F.3d 133, 148 (3d Cir. 2000)). Courts also consider the

18

importance of the untimely evidence, although even critical evidence may be excluded when the discovery violation is flagrant.  *Id.* (citing *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)).

Here, the Court's Scheduling Order required that Plaintiff disclose his expert witness by November 30, 2011.  (Dkt. No. 50).[10]  On that date, Plaintiff disclosed Green as his lone expert. (Dkt. No. 57).  He did not identify Dr. Kasbekar as an expert witness at that time or at any other time.  The May 30, 2012 hearing was the first time that Plaintiff requested that Dr. Kasbekar be allowed to testify at the trial, which is scheduled to commence on June 18, 2012.  Thus, Plaintiff is seeking to introduce the testimony of a very untimely disclosed expert witness on the eve of trial.

The Court finds that the Rule 37(c)(1) factors weigh strongly in favor of exclusion.  The prejudice to Defendant Pacific Cycle of allowing Dr. Kasbekar to testify as Plaintiff's expert at this late stage in the case is substantial.[11]  Dr. Kasbekar has not produced a report, his curriculum vitae, or prior cases in which he has testified pursuant to Rule 26(a)(2).  Thus, if Dr. Kasbekar were allowed to testify at trial, Pacific Cycle would be at a considerable disadvantage—lacking critical materials necessary for a proper cross-examination, and the opportunity contemplated by Rule 26 and the Court's Scheduling Order to explore the basis for his opinion with sufficient time to prepare a meaningful response.  *See Nicholas*, 227 F.3d at 148 (finding that disclosure of

---

[10]     Plaintiff's initial expert disclosure deadline was June 30, 2011, (Dkt. No. 8), but was extended once on joint motion of the parties, (Dkt. No. 31), and again on motion of the Plaintiff, (Dkt. No. 50).

[11]     Although Green's report relies heavily on Dr. Kasbekar's analysis, Green's deposition testimony would likely be of limited utility in obtaining an in depth review of Dr. Kasbekar's conclusions in view of Green's inability to respond to probing questions and his admitted lack of expertise in the area.

evidence by plaintiff one month before trial was "substantially prejudic[ial]" and thus excluding evidence under Rule 37(c)(1)); *In re TMI Litig.*, 193 F.3d at 721 ("Defendants would be prejudiced by the admission of certain of the untimely reports insofar as the rigorous pre-trial schedule precludes them from having sufficient time to prepare to cross-examine on the late-filed reports."); *Damiani v. Momme*, 2012 WL 1657920, at *3 (E.D. Pa. May 11, 2012) ("A supplemental report served on Defendants' counsel less than two weeks before trial leaves Defendants without sufficient time to respond . . . . Considering the factors set forth by the Third Circuit, the Court concludes that Dr. McCauley's supplemental expert report should be stricken."); *Morales v. City of Jersey City*, 2010 WL 5392693, at *5 (D.N.J. Dec. 22, 2010) (excluding expert report disclosed one month before scheduled trial date because it "amounts to a last-minute and unfair attempt by Plaintiff to revive an expert opinion that the Court had already found deficient. It leaves Defendant will little to no time to explore the contents of the report through deposition discovery and thus no opportunity to raise a meaningful challenge to the proffered testimony, unless the Court adjourns the trial.").

The factors regarding the ability to cure the prejudice and the extent to which allowing the untimely witness would disrupt the proceedings also militate against the inclusion of Dr. Kasbekar as an expert witness at this late stage of the proceedings.[12]  Plaintiff suggests that any prejudice can be cured by allowing Defendant to depose Dr. Kasbekar prior to trial. As discussed above, Plaintiff has not disclosed Dr. Kasbekar's report thus impeding the utility of any deposition. Moreover, trial is scheduled for June 18, 2012, which is less than three weeks from the date of the May 30, 2012 hearing.  Allowing Plaintiff to add Dr. Kasbekar as an expert

---

[12]     There is no evidence that Plaintiff's failure to previously identify Dr. Kasbekar as an expert witness pursuant to Rule 26(a) was in bad faith.

witness on the eve of trial would significantly disrupt the "orderly and efficient trial of the case," particularly in view of the long-expired November 30, 2011 expert disclosure deadline. *Gautier-James,* 2011 WL 4500153, at *5 (excluding expert witnesses disclosed six to seven months after deadline); *see also Nicholas*, 227 F.3d at 148 (finding that exclusion of untimely evidence was warranted because "permitting the evidence would likely require a lengthy stay and disrupt the orderly conclusion of the trial."); *Konstantopoulos*, 112 F.3d at 719 (finding that disclosure of expert witness three weeks before trial was a "flagrant disregard" for court's scheduling order, thus supporting exclusion of proposed expert); *Dura Automotive*, 285 F.3d at 616 (affirming district court's denial of motion to add additional expert witnesses after primary expert was excluded because "there [was] no justification for not disclosing to CTS the opinions of the other experts [] for Dura should have known that Valkenburg's expertise did not extend to scientific issues at once crucial to the *prima facie* case and likely to be contested."). Accordingly, the Court finds that exclusion of Dr. Kasbekar is warranted in these circumstances and Plaintiff may not call him as a witness at trial.[13]

## III.   CONCLUSION

The Court finds that because Green's expert opinion that the subject wheel was defectively manufactured is based exclusively on the opinion of Dr. Kasbekar, who has not been named as an expert by Plaintiff, and because Green lacks the specialized knowledge necessary to confirm, validate, or even explain Dr. Kasbekar's findings, Green's opinion that the causal factor

---

[13]     It is not disputed that Dr. Kasbekar may be a "critical" witness. However, as in *Dura*, it should have been apparent that Green's expertise did not extend to the central issue in this case, and no justification has been offered for Plaintiff's failure to timely identify Dr. Kasbekar as an expert witness. Because of the extremely last minute nature of Plaintiff's attempt to add Dr. Kasbekar as an expert, his exclusion is warranted. *Gautier-James*, 2011 WL 4500153, at *5 ("when a party has acted in 'flagrant' disregard of a court order, a court is authorized to exclude even 'critical evidence.'") (citing *Konstantopoulos*, 112 F.3d at 719)).

of the wheel collapse and the accident was the improperly manufactured front wheel rim does not meet the threshold requirements of Federal Rules of Evidence 702 and 703, nor the principles espoused in *Daubert*, and is thus inadmissible at trial.  Accordingly, the Court will grant in part Defendant Pacific Cycle's "Motion to Exclude Opinion Testimony of James Green," and will prohibit Green from testifying that the subject wheel rim was defectively manufactured or that the accident was caused by an improperly manufactured front wheel rim, or otherwise mention any of the analysis performed by Dr. Kasbekar.   However, Green may testify regarding "Engineering Conclusion" No. 1 in his expert report—"[t]he causal factor of the accident that occurred to the Cyclist was the collapse of the front wheel rim on the subject Mongoose Bicycle. There was no evidence of misuse of the subject cycle." (Green Report, Dkt. No. 57-1 at 6).  An appropriate Order accompanies this Memorandum Opinion.


Date: June 8, 2012                                    _____/s/_____
                                                      WILMA A. LEWIS
                                                      District Judge

22